STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| In re: Application of Charles Chandler | } } } } } | Docket No. 25-2-06Vtec |

Decision and Order

Appellant Charles Chandler appealed from a decision of the Development Review Board (DRB) of the Town of Newfane, denying permission for improvements to an existing residence, and denying permission for a shed building as accessory to the residential use of the property. Appellant appeared and represents himself; the Town of Newfane is represented by Samuel H. Angell, Esq. An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. A site visit was taken by Judge Wright alone, by agreement of the parties. The parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows. To the extent any proposed findings of fact and conclusions of law are incorporated in this decision, they are granted; otherwise, they are denied.

The property at issue in the present appeal, now owned by Appellant jointly with another, is a 2.11-acre parcel of land known as 1075 Vermont Route 30. It is located in Zoning District B of the Town of Newfane. It has just over 271 feet of frontage on the west side of Route 30, the major paved road through Newfane. In 1983, when it was owned by Bylee L. Gould and was subdivided from the adjacent lot to the north and west, a

1

residential mobile home (also referred to as a "trailer") was located on the lot in its present existing location. It was originally a 57' x 12' mobile home, and has a 39½' x 8' addition that has been in place for at least twenty years; it is 16'2" in height at the peak of the roof.

In connection with that 1983 subdivision, the Agency of Natural Resources, Division of Protection issued a state permit (#EC-2-1035) approving the subdivision, the on-site water supply (from a spring) and the wastewater disposal system for a single-family residence. The permit provided that "construction of other dwellings" on the property "is not allowed without prior review and approval by the Agency."

In 1995 Corwin R. McAllister obtained title to the property. It was in use as a residential rental property. Mr. McAllister first considered developing the property as a commercial pallet manufacturing facility. That proposal would have used the existing mobile home as an office and to provide bathroom facilities for the employees, as the manufacturing building was not planned to have plumbing. In October of 1996, Mr. McAllister had a consultant firm known as Flow Dynamics conduct a sewage disposal feasibility study of the property for that project, which concluded that "with careful management and engineering, this lot can support a primary and reserve leach field for a maximum of 150 g[allons] p[er] d[ay] (10 employees)." The diagram produced by the consulting firm in connection with that study designated the existing residential trailer as "future office (no residence)," and showed a proposed 24' x 40' building directly to the north of the existing trailer (with the reference "NO PLUMBING" in parentheses). The diagram showed the locations of the test pits and showed the approximate location of a proposed new leach field near Route 30 in the northeast corner of the property, with 25-foot setbacks to the side and front property lines.

As of early 2004, Appellant lived on an 11-acre parcel of land elsewhere in Newfane which he referred to at trial as the Baker Brook parcel. It was located on an unpaved road. He conducted his electrical supply business from his residential property. Appellant's

business, Chandler Electric Company,[1] was started by his grandfather in 1917; his father also worked in the business. The business involves installing power lines to properties and installing wiring and electrical fixtures in buildings at the customers' properties, and requires storage of the wiring materials and equipment for the business, but does not involve retail customers coming to the property to purchase electrical supplies. Appellant, who is a master electrician and is licensed in Vermont, is the owner of the business and his brother John Chandler, who is a journeyman electrician, is an employee of the business.

Prior to his involvement with the property that is the subject of this appeal, Appellant operated the office for the business from his home, scheduling electrical jobs in the region by telephone. The business' employees pick up the materials and the company's truck or trucks[2] from the business property, spending about a half hour in the process, and then drive to the customer's job site to perform the work.

At some time in approximately early 2004, Appellant began discussions with Mr. McAllister regarding the purchase of the property at issue in the present case. Appellant intended to move both his business and residence, and to operate much as he had done in his previous location, but with the benefit of direct access to a major paved road: Route 30.

In early 2004, a Permit Specialist with the Environmental Assistance Division of the Agency of Natural Resources requested a Project Review Sheet from the District Coordinator of the District II Environmental Commission regarding whether an Act 250 permit would be required for a project on the property. Mr. McAllister was listed as the owner of the property and Appellant was listed as the applicant. In the section of the

---

[1] Although it is referred to as "company" or "LLC" it is not a corporation or limited liability company, but rather appears to be the business name under which Appellant is doing business.

[2] No evidence was provided as to the number of employees or the number or types of truck used in the business, nor as to the types of materials stored outside in the business.

project review sheet for the Agency's wastewater management program, the Permit Specialist had checked off, incorrectly, that there was no water or sewer at the property and that there was so-called deferral of permit language in the deed. In fact the property did hold the 1983 permit for the water supply and wastewater systems, which had been installed and were serving the residential use of the mobile home.

The Permit Specialist's description of the project[3] read in full as follows:

> Subdividing an existing 2.2 acre parcel with an existing mobile home. The mobile home is to be removed and the buyer is proposing to purchase part of the land (<1 [acre]) for the construction of a storage building to store his materials and trucks. He runs his business from his home (11 acres). His home office is mainly to take jobs by telephone – his employees pick up the materials and truck from the storage building and work at the job site (only at the storage building for a short period of time approximately ½ hour). No repair or maintenance work on vehicles is done at this site.

The Assistant District Coordinator issued a determination on January 27, 2004, based on this description, that an Act 250 permit would be required, as this would be construction of improvements for a commercial purpose, and that all of Appellant's property within a five mile radius would be counted. That determination was issued as a Jurisdictional Opinion on the Project Review Sheet. A Jurisdictional Opinion or a project review sheet does not constitute an Act 250 permit or an Act 250 permit application. That is, nothing stated in it obligates an applicant to undertake a project or file an application as described on the project review sheet. Under Act 250, a permit may be required for construction of commercial improvements on a property regardless of whether there is or is not also a residence on the property.

In March of 2004, Mr. McAllister filed the first application for a zoning permit for

---

[3] While she must have derived this description from her interpretation of a conversation with either Mr. McAllister or Mr. Chandler, no evidence was presented of the source of this description.

4

this property: #04-12. Mr. McAllister's name appears as property owner and the field for "applicant" is blank. Mr. Chandler is not mentioned at all on this application. The application requested approval of the construction of a 40' x 60', 21-foot-high "storage building," without any indication of its intended use in connection with a business or with the residence on the property. At this time the mobile home was in use as a residential rental unit. Attached to the application was a sketch plan that used as its basis a photocopy of the 1996 Flow Dynamics plan, from which certain elements had been deleted and other elements had been added. The term "future office" continued to appear[4] on that sketch plan with reference to the mobile home, which continued to be labeled "existing trailer," but the term"no residence" was deleted. The location of the existing septic system serving the mobile home was added, but the potential location for a new leach field was deleted. Approximate setbacks to the property boundaries were added.

The Acting Zoning Administrator rejected the application on the basis that site plan approval was required from the Planning Commission, citing §§1230 and 6100 of the Zoning Bylaws. Section 6100 requires site plan approval for any new commercial developments or changes to existing commercial developments, and for any development other than a one- or two-unit dwelling and its appurtenant buildings and structures. Section 6100 also requires site plan approval for commercial development projects that require Act 250 approval, including multi-family residential development.

The Acting Zoning Administrator forwarded the application to the Planning Commission for it to consider site plan approval. The Planning Commission conducted a

---

[4] Based on the sequence of copies of this plan, and the comparison of the appearance of this term on the original sketch plan by Flow Dynamics (Exhibit A), and on the plan attached to the March 2004 permit application (Exhibit B), we find it more credible that the term simply remained on the plan (that is, that it was not deleted from the copy of the former plan) than that it was added to the plan by a town official.

site visit and a hearing on March 23, 2004, and granted site plan approval with conditions on March 30, 2004. The notice of decision reflected that only Mr. McAllister appeared at that hearing as the applicant. At trial of the present appeal, Mr. McAllister recalled that at the March 2004 hearing he intended that the mobile home would be used to provide toilet facilities for the pallet shop or whatever commercial use would be conducted in the new building.

The Planning Commission granted site plan approval for the building, which it characterized as a two-story garage with three motor vehicle bays, one entrance door, and "an open concept second floor with NO SANITARY FACILITIES." It was subject to six additional conditions relating to the driveway, a 60' x 60' parking area for employees, a parking area for "heavy motor vehicles,[5] trailers and equipment for long-term parking west of [behind] the existing structure" (that is, the mobile home), as well as conditions relating to construction of a fence, a business sign, and security lights.

Zoning Permit #04-12, allowing construction of the 60' x 40' building, was issued to Mr. McAllister on April 1, 2004. Nothing in the permit or the site plan approval obligated Mr. McAllister to actually build the project he had applied for, nor did the issuance of the permit, or the Act 250 project review sheet, without more, somehow "convert" the property to a commercial use. That is, Mr. McAllister or any purchaser of or applicant for the property could have abandoned the permitted project and applied for a permit to conduct

---

[5] It is possible that a particular project could be a home industry as defined under the Zoning Bylaws, and yet require site plan approval because of requiring Act 250 approval as a commercial project on more than an acre of involved land. However, because this proposal provided for heavy motor vehicle parking outdoors on the property, provided parking for more than a few employees, and showed the mobile home as "future office," it is reasonable that the Acting Zoning Administrator, who was also the chair of the Planning Commission, believed that the proposal did not fall under the use category of home industry but instead was being proposed as a conversion of the residential use of the mobile home to a commercial use for the property as a whole.

6

other uses on the property, which was still in fact in residential rental use.

At some point between April and the end of August of 2004, Mr. McAllister and Appellant entered into an oral agreement for the sale of the property to Appellant.

On or about September 1, 2004, Appellant and the Assistant District Coordinator for the District II Environmental Commission had a telephone conversation regarding Appellant's plans for the property, which Appellant followed up with a letter referring to the need for the letter "since it was not clear to you on the telephone what I was asking." Appellant stated in the letter that "I will be building a garage/storage shed on my property" and that the use of this building "is to park my car/truck in and store my property in." He stated that it would be a "single family dwelling location, owner occupied," on 2.11 acres, and that the proposed building was to be "detached from the single family home" and to be 28' x 70' in footprint and 21 feet in height (a different footprint than the size approved in Zoning Permit #04-12). Appellant asked whether he needed an Act 250 permit for this project.

Based upon the representations in that letter, on September 2, 2004 the Assistant District Coordinator issued a project review sheet (covering the need for an Act 250 permit only), characterizing the proposal as

> Constructing a 28' x 70' x 21' high garage/storage shed on his property that currently has a single-family residence on the lot. The building is to be used solely for personal use. No materials for the business will be stored in the garage/shed.

Based on this understanding of the proposal, the Assistant District Coordinator determined that no Act 250 permit was required and issued that determination as a Jurisdictional Opinion on the Project Review Sheet.

On September 2, 2004, Appellant also applied[6] for an amendment to Zoning Permit

---

[6] Appellant filled in the form as applicant, and stated "as above" in the space for property owner.

7

#04-12 to alter the size of the proposed building from 60' x 40' to 70' x 28', which amounted to a decrease of 440 square feet in its footprint. Under "type and use of structure" Appellant stated "Garage & or storage shed." The accompanying sketch plan showed the location of the existing mobile home, labeled "m.home," and the location of the proposed building, labeled "new." Nothing on the application or the sketch plan suggested that the building was being proposed for commercial purposes. The drawing of the building that accompanied the application shows an interior wall dividing the proposed building into two spaces, with two large openings into one space, suitable for overhead-type garage doors, and two standard-door-sized openings into the other space, with an interior stairway giving access to the attic space. The "amended zoning permit" was granted by the Acting Zoning Administrator the same day; no related amendment of the site plan approval was suggested or required as a prerequisite to its issuance.

Soon thereafter, Mr. McAllister must have filed with the District II Environmental Commission an application for an Act 250 Land Use Permit, Application #2W1187. No party submitted this application in evidence, although the accompanying sketch plan (Exhibit 6 in the Act 250 proceedings) was admitted as Exhibit 3 in the present appeal, and the Act 250 permit issued as a result of that application was admitted as Exhibit E in the present appeal.

The sketch plan submitted in the Act 250 permit application used as its basis a photocopy of the sketch plan that had been submitted in the September 2, 2004 zoning permit amendment application, from which certain elements had been deleted and other elements had been added. At the location of the mobile home, the word "home" appears within the outline for the building's footprint, with the words "single family home" written above it. At the location of the proposed garage, the word "garage" has been added below the word "new" that appeared in the zoning amendment sketch plan. The curb cut and various setbacks between buildings and property lines have been added, and two areas are

8

marked for parking, one in front of the home location, and another, labeled "parking, if needed" behind the two buildings.

The March 2004 site plan approval also must have been submitted to the District Commission, together with Zoning Permit #04-12 and its amendment (Exhibit 8 in the Act 250 proceedings), as it is referred to in the District Coordinator's September 7, 2004 letter to Mr. McAllister, a copy of which was sent to Appellant.

Based on the contents of that application, the District Coordinator concluded that Mr. McAllister still owned the property, that Appellant had a purchase and sales agreement with Mr. McAllister to buy the property, and that the building would be used to store materials used in Appellant's business. The District Coordinator therefore revised the Jurisdictional Opinion that had been issued in the 2004 project review sheet to conclude that "construction of the garage that would be used in the manner described in your application does require an Act 250 permit." The District Commission proceeded to consider the application and issued the Act 250 permit for the construction of a garage "for storage of personal and commercial materials and equipment" on October 8, 2004.

On September 29, 2004, the McAllisters transferred the property to "Phoenix Management Co.," a tradename registered in 2005 as "Phoenix Management" to one Faye Carvalho, and for which Appellant is the registered agent. The deed was recorded on October 15, 2004. The property transfer tax return stated that the property was used as a primary residence both before and after the transfer, and that it was exempt from Act 250 as an owner-occupied single-family residence. Appellant did not become an owner of the property until March of 2006.

The permitted new garage/storage building was built sometime between September of 2004 and the end of March, 2005, based on the fact that it appears on the sketch plan attached to a permit application filed on March 28, 2005. Mr. John Chandler, Appellant's brother, began living in the mobile home around the time that the new building was

9

constructed. The former tenants moved out shortly before Mr. John Chandler moved in. As of March 2005 a sign was installed on the property identifying the business as Chandler Electric Company, LLC.

On March 28, 2005, Appellant applied for Zoning Permit #05-14 to relocate, renovate or replace the existing 56-foot-long mobile home (single-family dwelling) with a 28' x 34' single-family dwelling in a different location on the property, behind or westerly of the new building. The sketch plan submitted with the application showed the new garage/storage building, labeled "shop," the existing location of the mobile home, and the proposed location of the new single-family dwelling.

The application was denied because the density limitations for Zoning District B require two acres for a single-family dwelling (or duplex), and two additional acres[7] for the next additional unit. Under §4412, each "commercial unit" requires the same acreage as a residential unit. The denial letter issued by the Zoning Administrator on April 7, 2005, stated that "Zoning Permit #04-12 established use of the property as commercial" and that as "the lot contains only 2.11 acres no other use can be permitted." Appellant appealed this denial to the Development Review Board (DRB) and appealed the DRB's denial to this Court in Docket No. 155-8-05 Vtec, which was consolidated with the present appeal for hearing. However, during these proceedings, Appellant stated that he was no longer seeking approval to move the mobile home to a different location, and Docket No. 155-8-05 Vtec was concluded as moot.

Appellant's brother, Mr. John Chandler, was living in the existing mobile home as of May of 2005. On May 2, 2005, the Acting Zoning Administrator visited the property to

---

[7] Section 5220 requires four acres per unit for dwelling units 6–10, and an increasing acreage per unit for greater numbers of dwelling units in the development, up to nine acres per dwelling unit for 31 or more units. The density limits apply whether the dwelling units are single family or multiple-unit buildings. Section 5240.

conduct a compliance inspection regarding three "overhang additions" that had been constructed on the new building beyond what had been contemplated by Zoning Permit #04-12, as amended. He issued Zoning Permit #05-23 on May 4, 2005, for the three overhang additions. No actual application form was prepared; instead, Appellant initialed the drawing of the structure that showed the measurements of the overhangs and their placement on the structure. Nothing on that drawing or the permit stated the use of the building as commercial, and no related amendment of the site plan approval was suggested or required as a prerequisite to the issuance of the zoning permit for the overhangs.

In the summer of 2005, Appellant applied in Application #05-63 to construct a 12' x 60' storage shed, approximately 14 feet in height, behind the existing mobile home. Nothing in the application stated the use of the structure as commercial or residential. After some delay due to a disagreement about whether the filing fee could include a prepaid amount for a prospective appeal, the Zoning Administrator granted the permit on August 15, 2005. No related amendment of the site plan approval was suggested or required as a prerequisite to the issuance of Zoning Permit #05-63 for the shed. The property was taxed as a non-residential property on the 2005 grand list. All of the buildings conform to the dimensional and setback requirements of the zoning regulations, except for the issue of density that is before the Court in the present appeal.

Court proceedings in the fall of 2005 involved a notice of violation mistakenly issued (and later withdrawn) for constructing a single-family dwelling without a permit (which was actually the construction of the permitted shed, but in a different location). On October 3, 2005 Appellant submitted an amended application for the 12' x 60' shed, 16 feet in height, in its as-built location behind the garage/shop building. Because the as-built location of the shed was relocated a distance from original permitted location behind the mobile home, the Zoning Administrator treated it as a new application and requested a

11

new application form.  After certain contested procedural issues were addressed by this Court in a telephone conference held on October 25, 2005 (memorialized in a written order on October 26, 2005), Appellant filed applications #05-83, to repair, replace or renovate the "single family dwelling" in its existing location, and #05-84, for the as-built 12' x 60' shed as accessory to the residence.   These applications were both denied by the DRB on the same basis as Application #05-14, that the property "is zoned commercial and any residential construction on the property must meet the requirements" of an additional two acres for the residential use, which this property does not meet.

On March 3, 2006, Faye Carvalho, on behalf of Phoenix Management, conveyed the property to herself and Charles Chandler.  At the present time, the buildings on the property are used as follows: the mobile home is in 100% residential use by Appellant's brother, who is an employee of but not a part-owner of the Chandler Electric business.  No evidence suggested that the office functions of the business are conducted from the property.  Appellant does not reside at the property.  The shed is in 100% residential use for storage as accessory to the residential use of the mobile home.  The garage/shop building is in use 50% for the business and 50% as accessory to the residential use of the mobile home, making the buildings on the property as a whole approximately 65% (by area) in residential use and 35% in use for the business.  No evidence[8] was presented from which the Court can make a finding as to the amount or degree of use of the outdoor area on the property for the business.

Section 5220 of the Zoning Bylaws, establishing the density limitations for Zoning District B, requires two acres for a single-family dwelling (or duplex), and two additional

---

[8] Judge Wright's observations of the business sign and the outdoor storage of large wire spools on the property do not constitute evidence, and no evidence of these features was presented on the record, whether through photographs or testimony.

acres for the next additional unit. Under §4412 of the Zoning Bylaws, each "commercial unit" requires the same acreage as a residential unit. As the lot is 2.11 acres in area, it cannot support two independent uses, one commercial and one residential.

However, neither the site plan approval granted to Mr. McAllister nor Zoning Permit #04-12, approving construction of the garage building, 'converted' or 'rezoned' the parcel from residential to commercial. Those approvals authorized Mr. McAllister to build the building as proposed in his application, but they did not preclude a later applicant from proposing a different application. The fact that site plan approval was required for the application only reflected that the application then proposed a project that required Act 250 approval or was otherwise defined as a 'commercial' project under the Bylaws.

The further subdivision of the property that was the subject of the first project review sheet described by the Permit Specialist was not pursued by either Mr. McAllister or Appellant, and need not be further considered.

As of the time that Appellant applied for the amendment to Mr. McAllister's permit for the garage/storage building, the property remained in single-family residential use. Appellant was entitled to proceed with the already-approved plans or to file his own applications for his own projects. At that time, he was entitled to apply to construct buildings that would be accessory to a continued residential use of the property, or to pursue a commercial use of the property, or to attempt to combine them as a home occupation/industry. The Jurisdictional Opinions he received from the Assistant District Coordinator and District Coordinator informed him of the consequences under Act 250 of those different choices.

Appellant's application for an amendment of Zoning Permit #04-12 showed the existing mobile home and the proposed somewhat smaller garage/storage building. Nothing in it suggested that the garage/storage building was being proposed for a commercial use as opposed to a home occupation or residential use.

13

The application form requires applicants to state the type and use of any proposed or renovated structures, but does not require applicants to state whether the proposed uses for the property or the structures are residential or commercial. Accordingly, nothing in the application raised the differences between the assumptions made by the applicant and the Acting Zoning Administrator. On the one hand, the Acting Zoning Administrator treated the use as remaining commercial, as proposed for the McAllister application, although it is not clear why the application was not then forwarded to the Planning Commission for an amendment to the site plan approval that would have been required for a commercial use or a part-commercial use subject to Act 250. On the other hand, Appellant pursued his intention to transfer the residence and business use as he had conducted it on his existing 11-acre parcel to this 2.1 acre parcel without understanding that to do so on the smaller parcel he would also have to comply with the home industry requirements of the Bylaws.

However, as Appellant did not in fact move to the residence on the property to operate the business in the same way he had operated it from his former residence, he did not at that time qualify for consideration as a home occupation or home industry. Such a business does not have to be operated by an owner of the property (although Appellant is now a part-owner of the property), but the business does have to be operated by a resident of the property. See 24 V.S.A. §4412(4). The present resident of the property, Mr. John Chandler, does not qualify as he is only an employee of the business.

The applications before the Court to repair the single-family dwelling for residential use and for approval of the shed for residential use could only be considered if the operation of the business on the property qualifies for approval as a home industry or occupation, or if the commercial use of the property is discontinued.

Appellant thus has the following three choices: to make the property solely commercial, solely residential, or residential with a home industry or home occupation.

14

That is, he may operate the business on the property and discontinue the residential uses, with any necessary zoning permit or site plan amendments for the changes in use of the mobile home and shed. He may maintain the residential uses on the property (whether rental or by some other arrangement for a family member) and discontinue the commercial uses, with any necessary zoning permit amendments for the changes to residential use of the garage/shop building and any associated changes in or discontinuance of the sign, fence, and outdoor storage or parking. Or, as in In re Appeal of Wright, Docket No. 062-4-04 Vtec (Vt. Envtl. Ct, Nov. 14, 2005), if an owner of the business were to reside on the property, an application could be filed seeing approval to operate the Chandler Electric business from the residence and accessory buildings as a home occupation or home industry, reducing the scope of the operation to meet the definition of those terms.

That is, even if an originally-residential property is changed to and receives a zoning permit for a commercial use, the owner or a subsequent owner is free to make a further application to convert it back to a primarily residential use. In any such application, it will be for the Zoning Administrator and DRB to rule in the first instance as to what aspects of the business fall within the definition of home industry, or whether the present operation of the business, such as its outdoor storage, would have to be reduced to qualify under the Bylaws, before those questions would be before the court. At a minimum, if any aspect of the business relies on vehicles of more than two axles, that aspect of the business could not be carried on as a home industry, but may have to be conducted on a different non-residential property or on a different property large enough to support two separate "units" of commercial and residential use on the same property. See definition of Home Industry/Occupation in Definitions section of the Zoning Bylaws.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that Applications #05-83, to repair, replace or renovate the "single family dwelling" in its existing location,

15

and #05-84, for the as-built 12' x 60' shed as accessory to the residence, cannot be approved until or unless the commercial use of the property is discontinued, or the business use of the property is otherwise approved as a home industry/occupation. Accordingly both applications are DENIED, but specifically WITHOUT PREJUDICE to their renewal if the conditions discussed in this decision are met, and specifically WITHOUT PREJUDICE to any alternative applications for the business use of the property as a home industry or home occupation, and specifically WITHOUT PREJUDICE to any alternative applications for commercial or business use of these buildings or this property as a whole.

Dated at Berlin, Vermont, this 6th day of December, 2006.

_____
Merideth Wright
Environmental Judge

16